UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JEREMY DANIEL SCHUH,

     Plaintiff,     Case No. 1:09-cv-982

v.              Honorable Robert J. Jonker

MICHIGAN DEPARTMENT
OF CORRECTIONS et al.,

     Defendants.
_____/

## **OPINION**

    This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim against Defendants MDOC, Klinesmith, Embry, Wayne, Breedlove, Norwood, Armstrong, Marschke & Kula. The Court also will dismiss all but Counts II and VI against Defendant Smith. The Court further will dismiss Count V against all Defendants. The Court will order service of the remainder of the complaint against 19 Defendants.

**Discussion**

I.  Factual allegations

Plaintiff Jeremy Daniel Schuh presently is incarcerated at the Baraga Maximum Correctional Facility (AMF), though the actions he complains of occurred while he was housed at the Ionia Maximum Correctional Facility (ICF). Plaintiff sues the Michigan Department of Corrections (MDOC), MDOC Director Patricia Caruso, MDOC Internal Affairs Manager Stephen Marschke, MDOC Special Activity Coordinator David Burnett, MDOC Special Activity Coordinator Michael Martin, MDOC Prisoner Affairs Administrator James Armstrong, and the following ICF employees: Warden Willie O. Smith; Inspector Betty Goodson; Chaplain G. Wyma; Assistant Resident Unit Manager (ARUM) J. Wayne; Assistant Resident Unit Supervisors (ARUS) Leslie Beak and J. Kula; Deputy Warden N. Norwood; RUM R. Embry; Grievance Coordinators Nancy Klinesmith and M. Breedlove; Regional Dietician Patricia Willard; Registered Nurse Megan M. Johnson; and Resident Unit Officers (RUO) R. Hernandez, Paul Gorman, Basil Woliver, Thomas Tkach, K. Datema, J. Sisson, T. Larh, J. Greenfield, J. Gagne, and A. Baitenger.

Plaintiff's lengthy complaint and supporting affidavit detail a variety of allegations against the 28 Defendants in support of nine separate claims. In his first claim, Plaintiff alleges that, on December 15, 2008, while making eye contact with Defendants Baitenger and Hernandez, Plaintiff swallowed approximately 70 to 80 Excedrin Migraine tablets. According to Plaintiff, despite seeing Plaintiff swallow the clearly toxic overdose, Defendants left the cell without initiating any medical response. Sometime later, after Plaintiff realized that Defendants Baitenger and Hernandez intended to take no action, Plaintiff "made it 'appear' as though I was hanging myself with a sheet in a last resort attempt to force Medical Attention for [the overdose]." (Aff. in Supp.

of Compl. at 3, docket #1 at 12.) Plaintiff was removed from his cell and taken to the unit dayroom. At that time, Plaintiff informed Defendants Beak, Gagne and Baitenger, as well as RUOs Montoya and Hall[1] that he had taken a toxic dose of Excedrin and had repeatedly asked for medical attention because his stomach was beginning to hurt. Plaintiff alleges that no one summoned medical assistance. Sometime thereafter, Defendant Nurse Johnson came to the dayroom to administer Plaintiff's regular medications. Plaintiff told Johnson that he had taken an overdose of Excedrin and had stomach pains. Johnson allegedly told Plaintiff that she had not been informed about any overdose and that Plaintiff looked fine to her. Johnson left the room saying that she did not care if Plaintiff died. Plaintiff was placed in an observation cell, where a corrections officer monitored him at all times. Plaintiff alleges that he vomited all night without receiving treatment. He had a migraine headache, could not walk properly, vomited blood, and had muscle spasms. At some point during the night, the third shift officer again contacted medical staff to have Plaintiff seen before 6:00 a.m. He was seen later that day by medical staff, and he had his blood drawn. By that time, Plaintiff had vomited everything out of his system. Plaintiff filed a grievance, which was denied by Defendant Wayne, who concluded that Plaintiff had informed Defendants about the pills for the first time after staff found him attempting to hang himself. Defendant Smith denied the grievance at Step II, and Defendant Armstrong denied the grievance at Step III.

In his second claim for relief, Plaintiff alleges that he has been confined to punitive and administrative segregation since January 2008. He was on loss-of-privileges (LOP) status much of this period and was not allowed to go to yard for exercise from April or May 2008 until at least August 2008, when he filed a grievance. Defendant Klinesmith rejected the grievance at Step I

---

[1] Neither Montoya nor Hall is named as a Defendant in this action.

because it was untimely based on the date of incident, January 8, 2008. At Step II, Defendant Warden Smith upheld the rejection, but indicated that Plaintiff had been offered yard on June 8 to June 12, 2008 and July 31 to August 7, 2008, all of which Plaintiff had refused. Plaintiff denies that he refused any opportunity to go to the yard. Defendant Armstrong denied his appeal at Step III. Plaintiff filed additional grievances, which were denied at Step I by Defendants Embry and Klinesmith and at Steps II and III by Defendants Smith and Armstrong, respectively.

Plaintiff's third claim alleges that, when he arrived at ICF from AMF on November 7, 2007, he was placed in administrative segregation. Plaintiff alleges that, under MDOC Policy Directive 04.05.120 and ICF Operating Procedure 05.03.130, while Plaintiff remained in administrative segregation, he was not allowed to use the telephone. Plaintiff alleges that the policies are unconstitutional. He sues Patricia Caruso as the official responsible for MDOC policies and Warden Smith as the official responsible for ICF policies. He also names Defendants Klinesmith, Norwood and Armstrong as the respective Step I, Step II and Step III grievance responders.

In his fourth claim, Plaintiff contends that, on October 7, 2008, he was assaulted and battered by Defendants Tkach and Greenfield, allegedly in retaliation for filing grievances. Specifically, he alleges that, while escorting the handcuffed Plaintiff to his cell, Tkach said, "So, you're the little fuckboy (homosexual) bitch Schuh who likes to write grievances on my buddies and get them into trouble huh." (Aff. in Supp. of Compl. at 8, docket #1 at 18.) Tkach then allegedly slammed Plaintiff into the wall maliciously and sadistically. With his mouth next to Plaintiff's ear and his forearm pressing Plaintiff's face into the wall, Tkach asked Plaintiff "if I liked that." (Aff. in Supp. of Compl. at 9, docket #1 at 19.) When Plaintiff did not respond, Tkach asked, "You want

me to put my finger(s) in your ass like my buddy Gorman did, don't you fuckboy, you liked that didn't you bitch?" (*Id.*) Defendant Greenfield stated, "[H]e liked it, . . . I know he did!" (*Id.*) Tkach then threw Plaintiff to the floor and jumped on Plaintiff's lower back, causing Plaintiff pain in his wrists from the restraints. Greenfield asked, "[H]ave you had enough yet Schuh?" (*Id.*) Plaintiff was placed in excessively tight leg shackles and walked backward to his cell. In Plaintiff's cell, Tkach threw Plaintiff on the bed, grabbed and squeezed Plaintiff's groin and testicles, and punched Plaintiff in the left eye with a closed fist. Plaintiff received injuries to both his groin and his eye areas. Plaintiff was then left in restraints for an extended period of time. Tkach wrote a major misconduct for threatening behavior, stating that Plaintiff had asked Tkach to stick his fingers in Plaintiff's rectum and had threatened to kill Tkach. Plaintiff was found guilty of the misconduct. Plaintiff filed a grievance, which was denied to at Steps I, II and III by Defendants Embry, Smith and Armstrong, respectively. Plaintiff's parents reported Tkach's assault to the MDOC Office of Internal Affairs. Inspector Goodson allegedly failed to properly investigate and attempted to cover-up the assault. Marshke allegedly failed to ensure that Goodson's investigation was properly conducted.

In his fifth claim, Plaintiff contends that he was not properly confined in a maximum security setting when he had only one non-violent felony conviction for concealing a stolen firearm. He filed a grievance about the placement, which was rejected as untimely by Defendant Klinesmith at Step I. He appealed the grievance, which was denied by the Step II and III respondents.

Plaintiff's sixth claim involves the denial of a Kosher diet and access to religious materials and clergy. Plaintiff alleges that, on November 28, 2007, he received a memorandum from Defendant Burnett, which stated that Plaintiff's request for a Kosher diet was denied on December 1, 2006, and his new request would be processed by the end of 2007. On December 6, 2007,

Defendant Smith sent a memorandum to Plaintiff, informing him that his request for a Kosher diet had been denied by Defendant Burnett on the basis of his history with the Kosher menu. The memorandum also stated that Plaintiff was "'un-able' to provide quite a bit of info about my faith of Judaism when I was interviewed by Chaplain - K. Snyder, at Baraga Max . . . ." (Aff. in Supp. of Pet. at 13, docket #1 at 23.) The memo also informed Plaintiff that he could not request another evaluation for a Kosher diet for one full year from the date of denial, pursuant to MICH. DEP'T OF CORR., Policy Directive 05.03.150. Plaintiff alleges that the memorandum improperly describes Snyder's recommendation, which stated that Plaintiff was *able*, not *unable*, to provide substantial information about Judaism during the interview and which recommended that Plaintiff be granted a Kosher diet. Plaintiff alleges that Defendant Caruso is responsible for the MDOC policy, which substantially burdens Plaintiff's religious rights. Plaintiff also complains that Defendant Smith was aware of Chaplain Snyder's recommendation and deliberately presented it in a false light in the memorandum.

Plaintiff alleges that Defendant Wyma subsequently re-tested Plaintiff for the Kosher diet, but falsely recorded Plaintiff's responses in order to deprive Plaintiff of his religious rights. Plaintiff claims that ICF Chaplain Wyma also has denied Plaintiff access to any Jewish religious material and has refused to arrange a religious visit with a local rabbi. He alleges that the denials violate his right to equal protection, as other prisoners are permitted access to religious materials and religious visits. Plaintiff further alleges that Defendants Burnett and Martin violated his right to free expression by denying his requests for a Kosher diet. In addition, Plaintiff contends that Defendants denials violate the Religious Land Use and Institutionalized Persons Act (RLUIPA), 42 U.S.C.

§ 2000cc. Finally, Plaintiff alleges that Wyma, Klinesmith, Smith, Norwood and Armstrong improperly denied his grievances.

In his seventh claim, Plaintiff alleges that he was improperly denied constitutionally adequate medical care because he has been refused an acid-reflux diet to help with his diagnoses of acid reflux, gastroesophageal reflux disease (GERD), and "esophlitis."[2] (Aff. in Supp. of Pet. at 25, docket #1 at 35.) Plaintiff alleges that he was told by a doctor on November 20, 2007 that he needed to consult with a dietician. Between that date and January 8, 2008, Plaintiff repeatedly kited to see the dietician, and his requests were ignored. He then filed a grievance that was rejected by Defendant Klinesmith on the grounds that the grievance was untimely because the date of the incident was November 20, 2007. The grievance denial was upheld by Defendants Norwood and Armstrong at Steps II and III. On April 23, 2008, Plaintiff filed another grievance, this time against Defendant Dietician Willard, for failing to respond to his requests. His grievance was denied by Defendant Klinesmith as duplicative, and the rejection was upheld at Steps II and III by Defendants Smith and Armstrong. On May 13, 2008, Plaintiff met with Defendant Dietician Willard. On May 19, 2008, Willard sent a memorandum, stating that she needed to review his file and refusing to place Plaintiff on a reflux diet until after they had meet again. The second meeting never occurred. Plaintiff filed a third grievance on August 3, 2008, which was denied at Step I by Nurse Bryan Deeren and at Step II by Region 2 Health Unit Manager Ed Hunt (neither of whom is named as a Defendant in this action). The Step III respondent was the Bureau of Health Care Services, which upheld the denials.

---

[2]Presumably, Petitioner means "esophagitis."

In his eighth claim, Plaintiff alleges that he was seriously physically and sexually assaulted and sexually harassed and that the assaults and harassment were retaliatory. On July 11, 2008, Plaintiff swallowed 50 Exedrin Migraine tablets while making direct eye contact with Defendant RUO Datema. Plaintiff asked Defendant Datema to contact medical staff for him. Datema slammed the door window shutter closed after telling Plaintiff that he had not seen anything and that he did not care if Plaintiff died. Datema did not call any medical personnel. Shortly thereafter, Plaintiff and his property were transferred in an intrafacility move. He was escorted from his cell in full restraints by Defendant RUOs Datema, Sisson, Larh and Woliver. When they entered Unit 2, Defendant RUO Gorman immediately instructed the other officers to bring Plaintiff to the dayroom, where no video cameras are located. Plaintiff was placed in the holding cell in the dayroom and was told to back up to the cell door so that the restraints could be removed. Plaintiff refused to back up, telling the RUOs that he needed medical attention because he had taken an overdose of pills and asking them to contact the sergeant. Defendant Woliver unlocked the door, entered the cell, and struck Plaintiff in the face, splitting open his left eye brow. Defendants Larh, Datema, Sisson, and Gorman joined Woliver and grabbed Plaintiff's arms and legs while he was still in restraints. The Defendants allegedly slammed the top of Plaintiff's head into the wall, causing his head to bleed. They then slammed him face-down onto the floor. Defendants Woliver, Sisson, Larh and Datema held Plaintiff's arms and legs down. While immobilized, Plaintiff felt a hand go up the leg of his shorts and felt two fingers penetrate and move back and forth in his rectum. Defendant Gorman then allegedly stated, "[T]his is what we do to fuckboys. How do you like that fuckboy." (Aff. in Supp. of Pet. at 28.) Plaintiff alleges that the sexual assault caused significant pain. Plaintiff then was dragged by the restraints to the cell door, where the restraints were removed.

While the restraints were being removed, RUOs Scott and Langin entered the dayroom. Once the restraints were removed, Defendants Woliver, Larh, Datema, Sisson and Gorman left the dayroom, laughing and slapping one another on the back. Shortly thereafter, Sergeant Slugbear entered the dayroom. Plaintiff was seen in the ICF medical department. He was transported to the Ionia County Hospital, where he received four stitches in the left eyebrow from Woliver's blow and was admitted to intensive care for head injuries and drug overdose. He was released the next day, July 12, 2008, and he was returned to ICF and placed on suicide watch.

On July 16, 2008, Defendant Woliver came to Plaintiff's cell and verbally taunted Plaintiff about the assault. Woliver allegedly threatened further harm to Plaintiff. Two days later, Defendant Datema came to Plaintiff's cell, taunting and threatening further harm. On July 19, 2008, Defendant Sisson allegedly came to Plaintiff's cell and made similar threats and taunts. Plaintiff previously had filed grievances against Sisson. On July 20, 2008, Woliver was assigned to work Plaintiff's wing and was the sole officer in charge of the wing. Woliver threatened and sexually degraded Plaintiff, causing Plaintiff to fear for his life. During subsequent rounds, Defendant Gorman repeatedly referred to the earlier incident, threatened further sexual assaults and engaged in "sexually predatory" behavior. (Aff. in Supp. of Pet. at 32.) On one occasion, Gorman allegedly threatened to kill Plaintiff and his family if Plaintiff did not drop his investigation into the July 11, 2008 incident. On several other occasions, Gorman denied Plaintiff his meal tray.

The use of force was investigated by Defendant Goodson. Plaintiff alleges that the investigation was so poorly conducted as to amount to deliberate indifference to Plaintiff's well-being. Defendant Marschke eventually denied the investigation on Defendants Gorman and Woliver. Plaintiff filed a variety of grievances about the incidents. Defendants Klinesmith, Embry, Wayne

and Greenfield denied those grievances at Step I.  Defendants Norwood and Smith denied the grievances at Step II, and Defendant Breedlove allegedly prepared at least some of those Step II grievances for signature.  Defendant Armstrong upheld the grievance denials at Step III.  In one of his grievances against Defendant Gorman, Plaintiff alleges that he spoke with Defendant Kula about his issues with Defendant Gorman.  Kula allegedly failed to resolve the problem.

Plaintiff also alleges that Defendant Gorman wrote a misconduct against him in retaliation for Plaintiff's past grievances and complaints against Gorman.  He further alleges that Defendant Greenfield exceeded his authority by rejecting one or more grievances at Step I.

In his ninth and final claim, Plaintiff alleges that he was assaulted in his cell on July 13, 2007, while he was sleeping.  Defendant Sisson and RUO Sawer (not a named Defendant) allegedly entered the cell.  They held Plaintiff down with their feet and roughly restrained him, causing injury and scars.  They then dragged him to the dayroom cell, where he could be interviewed by a psychologist.  Plaintiff filed a grievance, which was denied as meritless by Defendant Goodson. It was denied at Step II by Defendant Breedlove and at Step III by Defendant Armstrong.

### II. Sovereign Immunity

Plaintiff may not maintain a § 1983 action against the MDOC.  Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute.  *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826  (6th Cir. 1993).  Congress has not expressly abrogated Eleventh Amendment immunity by statute, *Quern v. Jordan*, 440 U.S. 332, 341 (1979), and the State of

Michigan has not consented to civil rights suits in federal court. *Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986). In numerous unpublished opinions, the Sixth Circuit has specifically held that the MDOC is absolutely immune from suit under the Eleventh Amendment. *See*, *e.g.*, *Turnboe v. Stegall*, No. 00-1182, 2000 WL1679478, at *2 (6th Cir. Nov. 1, 2000); *Erdman v. Mich. Dep't of Corr.*, No. 94-2109, 1995 WL 150341, at *1 (6th Cir. Apr. 5, 1995); *Cullens v. Bemis*, No. 92-1582, 1992 WL 337688, at *1 (6th Cir. Nov. 18, 1992); *Adams v. Mich. Dep't of Corr.*, No. 86-1803, 1987 WL 36006, at *1 (6th Cir. May 7, 1987). In addition, the State of Michigan (acting through the Michigan Department of Corrections) is not a "person" who may be sued under § 1983 for money damages. *See Lapides v. Bd. of Regents*, 535 U.S. 613 (2002) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989)). Therefore, the Court dismisses the Michigan Department of Corrections.

### III. Failure to state a claim

A complaint may be dismissed for failure to state a claim if "'it fails to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 129 S. Ct.

at 1949. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Ashcroft*, 129 S. Ct. at 1950 (quoting FED. R. CIV. P. 8(a)(2)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Defendants Klinesmith, Embry, Wayne, Breedlove, Norwood, Smith, Armstrong, Marschke & Kula

Plaintiff fails to make specific factual allegations against Defendants Klinesmith, Embry, Wayne, Breedlove, Norwood and Armstrong other than his claim that they failed to properly investigate or resolve one or more of his many grievances. In addition, Plaintiff's allegations against Defendant Kula are limited to a claim that she failed to solve Plaintiff's ongoing problems with Defendant Gorman after he complained to her. Further, Plaintiff's sole allegation against Defendant Marschke is that he failed to properly supervise Defendant Goodson's investigation of Tkach's

assault. Finally, the majority of the allegations against Defendant Smith involve his denials of Plaintiff's grievance at Step II.³

Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Ashcroft*, 129 S. Ct. at 1948; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be based upon the mere failure to act. *Grinter*, 532 F.3d at 575; *Greene*, 310 F.3d at 899; *Summer v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft*, 129 S. Ct. at 1948. Plaintiff has failed to allege that Defendants Klinesmith, Embry, Wayne, Breedlove, Norwood, Armstrong, Marschke and Kula engaged in any active unconstitutional behavior. Accordingly, he fails to state a claim against them. Further, Plaintiff's claims against Defendant Smith that rest on his denials of Step II grievances (Counts I, II, IV, V, VII, VIII and IX) are dismissed for failure to state a claim.

---

³Plaintiff's only other claims against Smith are Count III, in which he challenges Smith as the policymaker for an ICF policy that he alleges is unconstitutional, and Count VI, in which he alleges that Smith intentionally misrepresented Snyder's recommendation that Plaintiff be granted a Kosher diet so as to deprive Plaintiff of the diet.

### B. Security Level

Plaintiff's fifth claim for relief is that he was not properly confined in a maximum security setting because his underlying conviction was a nonviolent felony. Plaintiff fails to state a claim of constitutional magnitude.

The Supreme Court has held that a prisoner does not have a protected liberty interest in the procedures affecting his classification and security because the resulting restraint does not impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91(6th Cir. 1995), the Sixth Circuit applied the *Sandin* test to the claim of a Michigan inmate that the mandatory language of the MDOC's regulations created a liberty interest that he receive notice and hearing before being placed in administrative segregation. The court held that regardless of the mandatory language of the prison regulations, the inmate did not have a liberty interest because his placement in administrative segregation did not constitute an atypical and significant hardship within the context of his prison life. *Id; see also Mackey v. Dyke*, 111 F.3d 460, 463 (6th Cir. 1997). Under these authorities, to the extent that Plaintiff alleges that he was placed in a Level V security classification without due process, he fails to identify a cognizable liberty interest. Without a protected liberty interest, Plaintiff cannot successfully claim that his due process rights were violated because, "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250 (1983).

Moreover, the Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim*, 461 U.S. at 245; *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S.

215, 228-29 (1976). The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges. *See, e.g.*, *Cash v. Reno*, No. 97-5220, 1997 WL 809982, at *1-2 (6th Cir. Dec. 23, 1997) (prisoner's allegation that he was placed in a security level higher than warranted based on the information contained in his prison file failed to state a due process claim because he had no constitutional right to be held in a particular prison or security classification); *O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, at *1 (6th Cir. Mar. 22, 1993) (prisoner failed to state a due process or equal protection claim regarding his label as a "homosexual predator" because he did not have a constitutional right to a particular security level or place of confinement). Because Plaintiff does not have a constitutional right to a particular security level or classification, Count V of his complaint fails to state a claim.

### **Conclusion**

Having conducted the review now required by the Prison Litigation Reform Act, the Court determines that all claims against Defendants MDOC, Klinesmith, Embry, Wayne, Breedlove, Norwood, Armstrong, Marschke & Kula will be dismissed in their entirety for failure to state a claim under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). All claims against Defendant Smith except Counts II and VI will be dismissed. Count V of the complaint will be dismissed against all Defendants. The Court will serve the remainder of the complaint against Defendants Caruso, Burnett, Martin, Goodson, Wyma, Willard, Johnson, Hernandez, Gorman, Woliver, Tkach, Datema, Sisson, Larh, Greenfield, Beak, Gagne and Baitenger, and Counts II and VI against Defendant Smith.

An Order consistent with this Opinion will be entered.

Dated:   November 16, 2009          /s/ Robert J. Jonker
                                    ROBERT J. JONKER
                                    UNITED STATES DISTRICT JUDGE