UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEREMY DANIEL SCHUH,

          Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, *et al.*,

          Defendants.

_____/

Case No. 1:09-cv-982

Hon. Robert J. Jonker

## REPORT AND RECOMMENDATION

This is a civil rights action brought by a state prisoner in the custody of the Michigan Department of Corrections (MDOC). This matter is before the court on motions for summary judgment filed by defendant Johnson (docket no. 55), defendant Martin (docket no. 60), defendants Patricia Caruso and Donald Burnett (docket no. 71), and defendants Baitinger, Hernandez, Beak, Gagne, Smith, Wyma, Tkach, Greenfield, Goodson, Datema, Sisson, Lahr, Wolever, Gorman and Willard (docket no. 80).[1]

## I.     Background

Plaintiff originally filed a 56-page document which included a 10-page complaint form with a 46-page "affidavit" of allegations directed at 28 separate defendants. Compl. (docket no. 6).[2] In an opinion screening this document pursuant to the Prison Litigation Reform Act

---

[1] The court notes that defendants Baitinger, Lahr and Wolever are sometimes referred to as Baitenger, Larh and Woliver, respectively.

[2] The court notes that the complaint entered into the Case Management/Electronic Case Files (CM/ECF) docketing system at docket no. 1 omitted three pages. The entire complaint was correctly entered into the docketing system at docket no. 6.

(PLRA), the court construed the complaint as alleging nine counts. *See* Opinion (Nov. 16, 2009) and Order for Partial Service (Nov. 16, 2009) (docket nos. 4 and 5). The court dismissed nine defendants, dismissed Count V, and dismissed all counts directed at defendant Warden Smith except for Counts II and VI. *Id.* Plaintiff seeks declaratory relief, injunctive relief, compensatory damages and punitive damages against the remaining 19 defendants, who have filed motions for summary judgment. In reviewing plaintiff's claims, the undersigned adopts the claim construction as set forth in the court's opinion of November 16, 2009.

## II.    Legal Standard

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the standard for deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case. Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted). "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party." *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). However, the court is not bound to blindly adopt a non-moving party's version of the facts. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III.    Discussion

### A.    Count I

### 1.    Plaintiff's allegations

In this count, plaintiff alleged that on December 15, 2008, while making eye contact with defendants Resident Unit Officer (RUO) Baitinger and RUO Hernandez, he swallowed approximately 70 to 80 Excedrin Migraine tablets. Despite seeing plaintiff swallow the clearly toxic overdose, defendants left the cell without initiating any medical response. When plaintiff realized that Baitinger and Hernandez intended to take no action, plaintiff made it appear that he was hanging himself with a sheet so as to force defendants to provide him with medical attention. Plaintiff was removed from his cell and taken to the unit dayroom, where he informed corrections personnel, including defendants Assistant Resident Unit Supervisor (ARUS) Beak, RUO Gagne and RUO Baitinger, that he had taken a toxic dose of Excedrin. He repeatedly asked for medical attention because his stomach was beginning to hurt. Plaintiff alleged that no one summoned medical assistance.

Sometime thereafter, defendant Nurse Johnson came to the dayroom to administer plaintiff's regular medications. At that time, plaintiff told Johnson that he had taken an overdose of Excedrin and had stomach pains. Johnson allegedly told plaintiff that she had not been informed about an overdose, that he looked fine and that she did not care if plaintiff died. Plaintiff was placed in an observation cell, where he allegedly received no treatment and vomited blood, suffered a migraine headache, could not walk properly and had muscle spasms. At some point during the night,

3

the third shift officer contacted medical staff. He was seen the next day by medical staff and had his blood drawn. By that time, plaintiff had vomited everything out of his system. Plaintiff apparently claims that defendants RUO Baitinger, RUO Hernandez, ARUS Beak and RUO Gagne, and Nurse Johnson were deliberately indifferent to his self-inflicted serious medical needs in violation of the Eighth Amendment.

### 2. Eighth Amendment claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n. 2 (1984); *Stack v. Killian*, 96 F.3d 159, 161 (6th Cir.1996). To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law. *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

It is well established that an inmate has a cause of action under § l983 against prison officials for "deliberate indifference" to his serious medical needs, since the same constitutes cruel and unusual punishment proscribed by the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97 (l976). A viable Eighth Amendment claim consists of an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). A court considering a prisoner's Eighth Amendment claim must ask both if the alleged wrongdoing was objectively harmful enough to establish a constitutional violation and if the officials acted with a sufficiently culpable state of mind. *Hudson v. McMillian*, 503 U.S. 1, 8 (1992).

The objective component requires the infliction of serious pain or failure to treat a serious medical condition. *Hudson*, 503 U.S. at 8-9. With respect to the infliction of serious pain, courts recognize that "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Id.* at 8 (internal citations and quotation marks omitted). Similarly, "[b]ecause society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Id.* at 9.

The subjective component requires that the defendant act with deliberate indifference to an inmate's health or safety. *See Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991). To establish the subjective component, the plaintiff must show that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Mere negligence in diagnosing or treating a medical condition does not constitute an Eighth Amendment violation. *Id.* at 835. "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishment Clause." *Whitley v. Albers*, 475 U.S. 312, 319 (1986).

### 3. Defendants Baitinger, Hernandez, Beak and Gagne

RUOs Baitinger and Hernandez stated in affidavits that their first contact with plaintiff on December 15, 2008 was just after 6:00 p.m. when they were notified by Officer Mott that plaintiff was hanging by a bed sheet in his cell. *See* Baitinger Aff. at ¶ 4 (docket no. 81-3); Hernandez Aff. at ¶¶ 4-5 (docket no. 81-4). Both Baitinger and Hernandez deny that they saw

plaintiff ingest an overdose of medication or that plaintiff advised them of the overdose. *See* Baitinger Aff. at ¶¶ 3, 5-7; Hernandez Aff. at ¶¶ 3, 9.

In his affidavit, ARUS Beak stated that on that date, plaintiff did not advise him of the overdose and he did not observe plaintiff exhibiting any signs of medication overdose, such as severe stomach pain, vomiting or seizures. Beak Aff. at ¶¶ 3-5 (docket no. 81-5). RUO Gagne stated that she responded to plaintiff's cell at 1807 hours after Officer Mott observed plaintiff trying to hang himself. Gagne Aff. at ¶ 5 (docket no. 81-6). Plaintiff did not inform Gagne that he had ingested an overdose of medication or that he needed medical care. *Id.* at ¶¶ 4, 11. In her affidavit, Nurse Johnson stated that her only contact with plaintiff on December 15, 2008 was at 8:58 p.m., after he attempted to hang himself. Johnson Aff. at ¶¶ 3-4 (docket no. 56-3). While plaintiff told Nurse Johnson that he did not want to ride out on his scheduled transfer the following morning, at no time did plaintiff tell the nurse that he took an overdose of medication. *Id.* at ¶ 4.

Plaintiff has filed a verified complaint in this action. The factual allegations as set forth in the complaint are viewed as an affidavit for purposes of defendants' motion for summary judgment. *See Lavado v. Keohane*, 992 F.2d 601, 605 (6th Cir. 1993) (a verified complaint has the same force and effect as an affidavit for purposes of responding to a motion for summary judgment).[3] Based on these sworn statements, a genuine issue of fact exists as to whether defendants Baitinger, Hernandez, Leak and Gagne knew that plaintiff had taken an overdose of medication and

---

[3] The court notes that plaintiff included verification language as part of his 72-page brief in response to one motion for summary judgment. *See* docket nos. 97 and 97-1. However, the court does not construe this document, which consists primarily of legal arguments in opposition to defendants' motions, as an affidavit for purposes of resolving the outstanding summary judgment motions. Plaintiff also filed an 8-page affidavit in response to the other motions for summary judgment which is in appropriate form, being executed pursuant to the verification provision of 28 U.S.C. § 1746 and consisting of factual statements. *See* docket no. 89-3.

then failed to provide him with treatment for the overdose. Defendants, however, contend that the court should not adopt plaintiff's version of the facts for purposes of ruling on their motion for summary judgment because plaintiff's version is "blatantly contradicted" in the record to the extent that "no reasonable jury could believe it." *See Scott*, 550 U.S. at 380. Defendants point to certain medical records from December 15 and 16, 2008 which reflect: that plaintiff was being transferred on December 15th; that he did not want to be transferred; and that he first mentioned the overdose to health care at 7:04 a.m. on December 16th; and that plaintiff reported to health care the next day that he ingested "100 tylenols" as opposed to 70 to 80 Excedrin Migraine tablets. Defendants' Brief at p. 15 (docket no. 81). However, the court cannot address this argument because defendants have failed to provide all of the cited medical records.[4] The medical record does reflect a blood test for "overdose exposure" on December 16, 2008. See Medical Records (docket no. 92 at p. 24).

Viewing the evidence in the light most favorable to plaintiff, the court concludes that a genuine issue of material fact exists with respect to this claim. Accordingly, defendant Baitinger, Hernandez, Leak and Gagne's motion for summary judgment as to Count I should be denied.

### 4. Defendant Nurse Johnson

Progress notes prepared by Nurse Johnson at 8:43 p.m. reflect that she saw plaintiff following plaintiff's attempt to hang himself. MDOC Progress Notes (docket no. 56-3). This contemporaneous medical record is inconsistent with plaintiff's allegations, i.e., there is no mention of vomiting blood, muscle spasms or the inability to walk properly. Nurse Johnson further noted that plaintiff refused to talk to her as the examining nurse. While this medical record contradicts

_____

[4] The court notes that these records are not in sealed exhibit of plaintiff's medical records (docket no. 92).

plaintiff's alleged medical condition, the court notes that the record was prepared by a defendant who is alleged to have disregarded plaintiff's medical condition on that occasion. Viewing the evidence in the light most favorable to plaintiff, the court concludes that a genuine issue of material fact exists with respect to plaintiff's allegation that Nurse Johnson failed to treat him for a drug overdose. Accordingly, Nurse Johnson's motion for summary judgment should be denied as to Count I.

## B.     Count II

In this count, plaintiff alleged that he had been confined to punitive and administrative segregation since January 2008. He was on loss-of-privileges status much of this period and was not allowed to go to yard for exercise from April or May 2008 until at least August 2008. Plaintiff filed grievances regarding his lack of yard exercise. Warden Smith denied those grievances at Step II of the grievance appeal process. *See* docket no. 81-12 at pp. 4, 8, 12 and 17.[5] Plaintiff apparently alleged that his lack of exercise violated th Eighth Amendment. *See, e.g., French v. Owens*, 777 F.2d 1250, 155-56 (7th Cir. 1985) ("Lack of exercise may certainly rise to a constitutional violation. Where movement is denied and muscles are allowed to atrophy, the health of the individual is threatened and the state's constitutional obligation is compromised"). However, plaintiff has not alleged that Warden Smith was personally involved in the decision to limit his yard exercise other than to deny his grievance appeal at Step II. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "The mere denial of a prisoner's grievance states no claim of

---

[5] In response to Grievance IC-08-08-1805, Warden Smith rejected the appeal as untimely, but further noted that plaintiff refused yard days on multiple occasions in 2008 (i.e., June 8th, 9th, 10th, 11th, and 12th; July 31st; and August 1st, 2nd, 4th, 5th, 6th and 7th). *See* Grievances (docket no. 81-12 at p. 8).

constitutional dimension." *Alder v. Correctional Medical Services*, 73 Fed. Appx. 839, 841 (6th Cir. 2003). Accordingly, Warden Smith is entitled to summary judgment on Count II.

### C.    Count III

Plaintiff's third count involves a constitutional challenge to an MDOC Policy Directive . Plaintiff alleged that when he arrived at Ionia Maximum Correctional Facility (ICF) from Baraga Correctional Facility (AMF) on November 7, 2007, he was placed in administrative segregation. Plaintiff alleged that under MDOC Policy Directive 04.05.120, while in administrative segregation, he was not allowed to use the telephone. Specifically, plaintiff alleged that he was denied a right to make a telephone call to his family and to call a prospective lawyer. Compl. at p. 17. Plaintiff alleged that the policy is unconstitutional. He has sued MDOC Director Patricia Caruso as the official responsible for MDOC policies.[6]

At the time of plaintiff's segregation in November 2007, Policy Directive 04.05.120 stated that a prisoner in any type of segregation shall be provided with:

> Telephone privileges for verified serious family emergencies, as determined by the Warden or designee, and for communicating with an attorney upon the request of the attorney.

Policy Directive 04.05.120 ¶ U 20 (effective March 27, 2006).[7]

---

[6] Plaintiff also alleged that ICF Operating Procedure 05.03.130, which apparently included a similar restriction on telephone communication, was also unconstitutional, naming Warden Smith as the official responsible for this policy. However, the court dismissed this claim. *See* Opinion (Nov. 16, 2009) at p. 15.

[7] The court notes that defendants provided the court with a copy of Policy Directive 04.05.120 (effective July 21, 2008) which superseded the 2006 version and provides that a prisoner in any type of segregation shall be provided with "[t]elephone privileges for verified serious family emergencies, as determined by the Warden of designee, and for communicating with an attorney regarding official business of the prisoner, including litigation, upon request of the attorney." Policy Directive 04.05.120 ¶ Y 19. While Director Caruso's affidavit references "attached copies" of previous versions of the Policy Directive, the attached copies were not filed with the court. *See* Caruso Aff. at ¶ 7 (docket no. 72-4).

An inmate has no right to unlimited telephone use. *Washington v. Reno*, 35 F.3d 1093, 1100 (6th Cir. 1994). *See also, Brown v. Long*, No. 96-5567, 1997 WL 63136 at *1 (6th Cir. Feb. 12,1997) ( "plaintiff [prisoner] has no constitutional right to unlimited access to a telephone, particularly during his confinement in segregation") *See also, Dede v. Baker*, No. 93-2319, 1994 WL 198719 (6th Cir. May 18, 1994) ("there is no constitutional right to have continuous access to a television and telephone while incarcerated"); *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) ("[a]lthough prisoners have a constitutional right of meaningful access to the courts, prisoners do not have a right to any particular means of access, including unlimited telephone use").

Plaintiff's constitutional challenge fails because the regulation limiting telephone access does not impinge on a constitutional right. As previously discussed, plaintiff has no constitutional right to unlimited or continuous access to a telephone while in prison. Defendants point out that while plaintiff was not able to make routine telephone calls, he had alternate means of communication, such as writing letters to his family to have them locate an attorney. Accordingly, defendant Caruso is entitled to summary judgment on Count III.

**D.    Count IV**

**1.    Plaintiff's allegations**

In this count, plaintiff alleged that he was assaulted by defendants RUO Tkach and RUO Greenfield in retaliation for filing grievances. Plaintiff alleged that on October 7, 2008, while escorting plaintiff to his cell, Tkach and Greenfield made sexually explicit comments or threats directed at him. Tkach threw plaintiff to the floor, jumped on his lower back, then placed plaintiff in excessively tight leg shackles and walked him to his cell. Once there, Tkach threw plaintiff on the bed, grabbed and squeezed plaintiff's groin and testicles, and punched him in the left eye. As

a result of this incident, defendant Tkach wrote a major misconduct for threatening behavior, stating that plaintiff had asked Tkach to stick his fingers in plaintiff's rectum and had threatened to kill Tkach. Plaintiff admits in his complaint that he was found guilty of the misconduct for threatening behavior.

MDOC medical records reflect that RN Habtemariam visited plaintiff the next day (October 8, 2008) in response to a kite from plaintiff which stated:

> Assaulted by unit officers. My wrists are swollen, my right eye is bruised, and I have some neck pain. I was denied proper HC.

MDOC medical records (docket no. 92 at p. 14).[8] Upon examination, plaintiff stated that "This happened yesterday around 3 p.m." *Id.* The nurse noted bruising to the right lateral periorbital area, no swelling around eye or bilateral wrists, superficial scratches to right wrist area, and that plaintiff was able to move his neck, both writs and lower extremities without any problem, and able to bend down, ambulated to cellside in a steady gain, with "no c/o alteration in vision voiced." *Id.* Plaintiff made no mention of having been punched in the testicles. *Id.* Plaintiff was given a cold compress for the affected area and told to contact health care with concerns or worsening of condition. *Id.* Plaintiff's parents reported Tkach's alleged assault to the MDOC Office of Internal Affairs, but the investigator (Inspector Goodson) failed to properly investigate and attempted to cover-up the assault.

### 2.    Affidavits of RUO Tkach and RUO Greenfield

Defendants have submitted affidavits denying that this event occurred as alleged on October 7, 2008. Defendant Tkach stated: that while escorting plaintiff at 4:01 p.m., plaintiff began

---

[8] The court notes that plaintiff's verified complaint states that RUO Tkach "punched me in my left eye area with his closed fist." Compl. at p. 19. However, plaintiff reported to health care that his right eye was bruised and the medical record reflects an injury to that eye area with no mention of an injury of the left area. MDOC Medical records (docket no. 92 at p. 14).

to break away from the escort and resisted staff; that (non-party) Officer Mygrants and Tkach ordered plaintiff to stop resisting staff; that plaintiff continued to resist and was placed against the wall to gain control; that he did not throw plaintiff to the ground or jump on him as alleged in the complaint; and that he did not grab or squeeze plaintiff's groin and testicles or punch him in the eye as alleged. Tkach Aff. at ¶¶ 3-5, 7-11 (docket no. 81-13). Tkach further denied that he made the following statements attributed to him by plaintiff:

> So, you're the little fuckboy bitch Schuh who likes to write grievances on my buddies and get them in trouble, huh? You want me to put my finger in your ass like my buddy Gorman did, don't you fuckboy, you liked that didn't you bitch.

*Id.* at ¶ 6.

Defendant Greenfield stated in his affidavit: that he observed Officers Tkach and Mygrants place plaintiff against the wall of the Unit 2 A-Upper gallery to gain control of him; that he instructed (non-party) Officer Martin to retrieve a shield and leg irons and then responded to the incident; that he instructed (non-party) Officer Hair to place leg irons over plaintiff as Martin held the shield over his upper body; that he, Tkach and Mygrants ordered plaintiff to stop resisting; that as plaintiff was walking backwards he again began resisting; that Officers Mygrants and Tkach placed plaintiff on the floor to gain control; that plaintiff eventually complied with commands from Tkach and him to stop resisting; that they escorted plaintiff backwards to his cell; and that plaintiff was placed in his cell without further incident. Greenfield Aff. at ¶¶ 4-9. Greenfield further stated that plaintiff refused treatment from Health Care staff. *Id.* at ¶ 9. Finally, Greenfield denied saying that "He liked it, I know he did" (in reference to Tkach's statement that Gorman put a finger in plaintiff's rectum). *Id.* at ¶¶ 10-11.

### 3.      Retaliation

Plaintiff alleged that he was assaulted by RUO Tkach and RUO Greenfield for filing grievances.  To prove a First Amendment retaliation claim, plaintiff must establish three elements: "1) the plaintiff engaged in activities protected by the Constitution or statute;  2) the defendant took an adverse action that would deter a person of ordinary firmness from continuing to engage in that conduct; and 3) that this adverse action was taken at least in part because of the exercise of the protected conduct." *Smith v. Campbell*, 250 F.3d 1032, 1037 (6th Cir. 2001).  *See also Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc).   Courts recognize that retaliation rarely can be supported with direct evidence of intent.  *Harbin-Bey v. Rutter*, 420 F.3d 571, 580 (6th Cir. 2005).  However, a plaintiff claiming retaliation must present more than conclusory allegations of retaliatory motive.  *Id.*  To establish the causation element of a retaliation claim, "the plaintiff must be able to prove that the exercise of the protected right was a substantial or motivating factor in the defendant's alleged retaliatory conduct." *Smith*, 250 F. 3d at 1037, *citing Mount Health City School District Board of Education v. Doyle*, 429 U.S. 274, 287 (1977).  "[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations." *Bennett v. Goord*, 343 F.3d 133, 137 (2nd Cir. 2003) (internal quotation marks omitted). Here, plaintiff has presented only the most conclusory allegations in support of his retaliation claim.  He does not identify any particular protected conduct which gave rise to the alleged retaliation other than filing grievances or demonstrate causation.  Accordingly, RUO Tkach and RUO Greenfield are entitled to summary judgment on the First Amendment retaliation claim.

### 4.    Assault

In his verified claim, plaintiff alleged that he was assaulted by RUO Tkach and RUO Greenfield.  The medical record indicates that plaintiff suffered some injuries which he attributed to an assault.  Both Tkach and Greenfield deny that they assaulted plaintiff.  A genuine issue of material fact exists as to whether the alleged assault occurred.  Accordingly, defendant Tkach and Greenfield's motion for summary judgment should be denied as to the assault claim.

### 5.    Failure to investigate

Inspector Goodson seeks summary judgment on plaintiff's claim that she failed to conduct a thorough investigation of this matter.  In her affidavit, Inspector Goodson stated that she performed an investigation of the alleged assault on October 16, 2008.  *See* Goodson Aff. at ¶ 6 (docket no. 81-15).  In performing her investigation, Goodson reviewed the critical incident report, conducted interviews with RUO Tkach, other officers and medical staff, and found no evidence to support plaintiff's claim.  *Id.* at ¶ 7.  In this regard, Goodson noted that plaintiff made no complaint about an alleged sexual assault to medical staff whom he saw the same day as the alleged assault. *Id.*  Inspector Goodson's investigation was reviewed by Internal Affairs supervisory staff and by Director Caruso, who all concurred in her findings and conclusions.  *Id.* at ¶ 8.  While plaintiff disagrees with Inspector Goodson's conclusion, he has presented no evidence to demonstrate that she performed an improper investigation.

Even if plaintiff had presented such evidence, plaintiff's claim fails because prison officials do not incur § 1983 liability  for failing to properly investigate a prisoner grievance.  *See Carlton v. Jondreau*, 76 Fed. Appx. 642, 644 (6th Cir. 2003) (while a prisoner has a First Amendment right to file grievances against prison officials,  there is not a federal due process

obligation for a state to follow its grievance procedures or "to properly investigate" a grievance); *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005) (inmate's claim that prison officials failed to investigate his grievances that mailroom and security staff was stealing his property was meritless because inmate did not have a due process right to an investigation); *Wilkins v. Illinois Department of Corrections*, No. 08-cv-732-JPG, 2009 WL 1904414 at *9 (S.D. Ill. July 1, 2009) ("Because inmates do not have a due process right to have their claims investigated at all, an allegation that any investigation which is actually conducted by prison officials was 'inadequate' or 'improper' does not state a constitutional claim"). Inspector Goodson is entitled to summary judgment on Count IV.

### E.      Count VI

### 1.      Plaintiff's allegations

In Count VI, plaintiff alleged that he was denied a Kosher diet (the Kosher Menu Accommodation), denied access to religious materials and denied access to clergy. Plaintiff alleged that on November 28, 2007, he received a memorandum from defendant Special Activities Coordinator Burnett, stating that his last request for a Kosher diet had been denied on December 1, 2006, and that a new request would be processed by the end of 2007. Indeed, on December 6, 2007, defendant Warden Smith sent a memorandum to plaintiff advising: that his request for a Kosher diet had been denied by Burnett on the basis of his history with the Kosher menu; that plaintiff was unable to provide sufficient information about Judaism when he was interviewed by Chaplain Snyder at AMF; and that plaintiff could not request another evaluation for a Kosher diet for one full year from the date of denial, pursuant to MDOC Policy Directive 05.03.150. Plaintiff

alleged that Special Activities Coordinators Burnett and Martin violated his right to free expression by denying his requests for a Kosher diet.[9]

Plaintiff also alleged that Director Caruso is responsible for MDOC Policy Directive 05.03.150 which substantially burdens his religious rights and is "constitutionally invalid." Compl. at p. 33. In an affidavit in opposition to the motion for summary judgment, plaintiff expresses his main concern with the Policy Directive 05.03.150 as requiring him to wait for one year before re-applying for a religions menu. *See* Schuh Aff. at ¶¶ 4-5 (docket no. 89-3). This requirement forced him to violate his belief for a full year, hindering his ability to exercise his Jewish beliefs. *Id.* The court will construe these statements as the basis for plaintiff's constitutional challenge.

Plaintiff alleged that defendant ICF Chaplain Wyma violated his rights under the First Amendment when the chaplain falsely recorded his responses in a Kosher test, denied plaintiff access to any Jewish religious material, and refused to arrange a religious visit with a local Rabbi.[10]

Finally, plaintiff alleged that defendants violated RLUIPA.[11]

### 2. Injunctive relief for a Kosher Menu Accommodation

As a preliminary matter, the court has addressed plaintiff's request for injunctive relief with respect to the Kosher Menu Accommodation. In ruling on plaintiff's motions for a

---

[9] Dave Burnett retired from his position as Special Activities Coordinator, Correctional Facilities Administration (CFA) on December 29, 2007. Burnett Aff. at ¶ 3 (docket no. 72-3). Michael Martin has held the position since April 20, 2008. Martin Aff. at ¶ 2 (docket no. 69-2).

[10] Plaintiff also alleged that Chaplain Wyma's actions violated his right to equal protection, because prisoners of other faiths were permitted access to religious materials and revisits with religious clergy. However, defendants did not raise this claim in their motion for summary judgment.

[11] Defendants' motion also seeks summary judgment on retaliation claims associated with the denial of the Kosher menu accommodation. However, these claims were not identified in the opinion construing plaintiff's complaint.

preliminary injunction and temporary restraining order, the court held that plaintiff "has acknowledged that he is now receiving a Kosher diet, which moots his request for injunctive relief in the form of a Kosher diet."  Order Approving Report and Recommendation at p. 3 (docket no. 102).  Accordingly, plaintiff's request for injunctive relief in the form of a Kosher Menu Accommodation should be dismissed as moot.

### 3.     First Amendment claims

To the extent that plaintiff alleged a violation of the First Amendment, he seeks relief pursuant to 42 U.S.C. § 1983.  Plaintiff's First Amendment claim alleged interference with the exercise of his religious beliefs.  "The First Amendment provides in pertinent part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison."  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979).  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987) (internal citation omitted).  However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."  *Id.* quoting *Price v. Johnston*, 334 U.S. 266, 285 (1948).  This limitation of privileges arises "both from the fact of incarceration and from valid penological objectives - including deterrence of crime, rehabilitation of prisoners, and institutional security."  *Id.* citing *Pell v. Procunier*, 417 U.S. 817, 822-23 (1974).  Evaluation of penological objectives is committed to the considered judgment of prison administrators who are charged with and trained in the running of the particular institution under examination.  *Id.* at 349.  To ensure that courts afford appropriate

deference to prison officials, the Supreme Court has "determined that prison regulations alleged to infringe constitutional rights are judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights." *Id.* As the court stated in *Cruz v. Beto*, 405 U.S. 319, 322 n.2 (1972), "reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendment without fear of penalty."

### a. Policy Directive 05.03.150

Policy Directive 05.03.150 regulates a prisoner's ability to request a religious menu:

> SS.    A prisoner may eat from a religious menu only with approval of the CFA Special Activities Coordinator.  Approval shall be granted only if it is necessary to the practice of the prisoner's designated religion.  To request approval, the prisoner must submit a written request to the Warden, TRV Manager, or designee, as appropriate, who shall obtain information regarding the prisoner's request and religious beliefs prior to referring the request to the CFA Special Activities Coordinator.  The CFA Special Activities Coordinator shall notify the Warden, TRV Manager or designee, as appropriate, of the decision; the Warden or TRV Manager shall ensure that the prisoner is notified.  A prisoner whose request is denied shall not be allowed to submit another request to eat from that religious menu for at least one year.

Policy Directive 05.03.150 ¶ SS.[12]

Another relevant document is MDOC Operating Procedure 05.03.150A, "Kosher Meal Program" (docket no. 69-2), which requires a prisoner who wants to participate in the Kosher Meal Program to submit a written request to the warden or designee for approval.  MDOC Operating

---

[12] Defendants have provided the court with a copy of Policy Directive 05.03.150 (effective 9/20/07). *See* docket no. 69-2.  Defendants sometimes refer to the religious menu provision as ¶ TT rather than ¶ SS. The court notes that a previous version of Policy Directive 05.03.150 (effective 5/24/04) designated this identical religious menu provision as ¶ TT.

Procedure 05.03.150A ¶ K.[13]  Upon receipt of a request the warden shall verify that the prisoner is eligible to participate in the program based on the prisoner's designated religion, by requiring the Assistant Deputy Warden for Programs or the chaplain to interview the prisoner and obtain a response to the following questions:

> 1.      Briefly explain the major teachings of your designated religion.
>
> 2.      Why is a kosher diet required by this religion?
>
> 3.      What is a kosher diet?  In other words, how does it differ from food otherwise provided by the institution?  What types of food are not allowed?

*Id.* at ¶ L.

A written report of the responses to the questions, along with the prisoner's request, will be referred to the Special Activities Coordinator, with a recommendation as to whether a Kosher diet should be approved.  *Id.* at ¶ M.  Then, the Special Activities Coordinator shall review the documentation and advise the warden whether the request is approved.  *Id.*  The warden shall ensure that the prisoner is advised if the request is not approved.  *Id.*  If the request is approved, and the prisoner is at a facility which provides Kosher meals, arrangements shall be made to provide the Kosher Meal Program to the prisoner.  *Id.* at ¶ M.  If the request is approved, and the prisoner is at a facility which does not provide Kosher meals, the prisoner shall be transferred in accordance with institutional operating procedures to a facility which provides the Kosher Meal Program.  *Id.* at ¶ N. Prisoners can be removed from the Kosher Meal Program for various reasons (e.g., changing religious affiliation to a religion which does not require a Kosher diet, being observed eating from

---

[13] In her affidavit, Director Caruso stated that while she has the authority and responsibility to issue and enforce policies that govern the operations of the MDOC, operating procedures (such as 05.03.150A "Kosher Meal Programs") are prepared by each administration (in this case the Correctional Facilities Administration) without her direct involvement.  Caruso Aff. at  ¶¶ 6 and 12.

the main line, being observed eating food that is not Kosher, and being observed possessing foods that are not Kosher). *Id.* at ¶ Q. A prisoner who has been removed from the Kosher Meal Program may reapply for participation no sooner than 60 days after the first removal from the program and one year after the second removal from the program. *Id.* at ¶ S.

A regulation impinging on prisoner constitutional rights is valid if it is reasonably related to legitimate penological purposes. *Turner v. Safley*, 482 U.S. 78, 89 (1987). In *Turner*, the Supreme Court expressly rejected any degree of "heightened scrutiny" in order to assure that "prison administrators. . . and not the courts. . . make the difficult judgments concerning institutional operations." *Id.* at 89, quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 128 (1977). The court in *Turner* set forth four factors "relevant in determining the reasonableness of the regulation at issue." *Turner*, 482 U.S. at 89-91. First, there must be a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. *Id.* at 89. Second, the reasonableness of a restriction takes into account whether there are "alternative means of exercising the right that remain open to the prison inmate." *Id.* at 90. Third, the court should consider the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally." *Id.* Finally, the existence or absence of ready alternatives of accommodating the prisoner's rights is relevant to reasonableness. *Id.* As stated by the court, this final factor "is not a 'least restrictive alternative' test." *Id. See, e.g., Procunier v. Martinez*, 416 U.S. 396, 420 (1974) ("prison administrators are not required to adopt every proposal that may be thought to facilitate prisoner access to the courts").

Defendants have included sufficient documentation in their briefs to demonstrate that the operating procedure and policy directive regarding the "test" for Kosher menu accommodation

meets the reasonable basis test for a regulation affecting prison inmates under *Turner*. Current

Special Activities Coordinator Martin presented four penological interests that the state has in

regulating the Kosher menu accommodation in his affidavit:

> 9. First, allowing prisoners who are not sincere to participate in the kosher menu is offensive to those who are sincere, and can lead to conflict between the prisoners and between groups of prisoners.
>
> 10. Second, careful review of prisoners' religious diet requests is necessary to ensure that prisoners are not seeking placement in the Kosher Meal Program as a way of manipulating a transfer, as not all correctional facilities offer the Kosher Meal Program.
>
> 11. Third, there are compelling economic interests. Providing kosher meals requires extra effort and extra expense when compared to the statewide meal program. Separate kosher kitchens are maintained at selected prison sites. It is expensive to build and equip a kosher kitchen. The kosher kitchen and kosher food storage are limited in size. There is an interest in using this valuable space only for those who are sincere about the pursuit of their religious faith.
>
> 12. Fourth, in addition to the logistical requirements of keeping a kosher kitchen, the meal cost is at two to three times that of the meals from the main food line. That extra effort and expense should be reserved only for those whom the meals are a religious requirement, and who demonstrate that they have enough knowledge to enable them to abide by the requirements of their faith and the sincerity to do so.

Martin Aff. at ¶¶ 9-12 (docket no. 69-2).

Former Special Activities Coordinator Burnett characterized the state interest in the

one-year re-application process for the Kosher menu accommodation as follows:

> There is a compelling government interest in limiting the frequency of which a prisoner can request a religious menu accommodation. With approximately 50,000 prisoners (at the time when these decisions were made in response to prisoner Schuh's requests), the Department could be overwhelmed with processing religious menu requests if there were no limits on the frequency of requests. Processing a religious menu request includes an interview as well as checking the prisoner's history and processing the paperwork.

Burnett Aff. at ¶ 11 (docket no. 72-3).

Defendants have set forth sufficient reasons to demonstrate that the regulation of the Kosher menu accommodation as set forth in MDOC Policy Directive 05.03.150 and Operating Procedure 05.03.150A is reasonably related to legitimate penological interests. In reaching this determination, the court concludes that the prison authorities do not understate the penological interests involved in processing religious menu requests, given that the MDOC allows prisoners to change their religious affiliation (i.e., "convert" to a different religion) twice a year and the ease with which prisoners can make this change. Contrary to plaintiff's assertion (*see* Schuh Aff. at ¶ 5), the applicable test does not require that the MDOC provide the "least restrictive" method to accomplish the government's interest. *Turner*, 482 U.S. at 90. For these reasons, plaintiff's constitutional challenge of the Policy Directive fails. Accordingly, Director Caruso is entitled to summary judgment on Count VI.

### b. Special Activities Coordinators Burnett and Martin

Plaintiff alleged that defendants Burnett and Martin violated his right to free expression by denying his requests for a Kosher diet. Defendants seek summary judgment on this claim based upon the defense of qualified immunity.

Qualified immunity from civil actions for damages is not a mere defense to liability, but rather absolute immunity from suit and an entitlement not to stand trial, which should be determined at the earliest possible stage in litigation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). Government officials have qualified immunity from suit under § 1983 for damages arising out of the performance of their official duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Consequently, the doctrine of qualified immunity protects "all but the plainly

incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"A defendant enjoys qualified immunity on summary judgment unless the facts alleged and the evidence produced, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Morrison v. Board Of Trustees Of Green Township*, 583 F.3d 394, 400 (6th Cir. 2009). Courts can exercise their sound discretion "in deciding which of the two prongs of the qualified immunity analysis should be exercised first in light of the circumstances of the particular case at hand." *Jones v. Byrnes*, 585 F.3d 971, 975 (6th Cir. 2009), quoting *Pearson v. Callahan*, -- U.S. --, 129 C. Ct. 808, 818 (2009).

Here, neither Burnett nor Martin violated plaintiff's clearly established constitutional rights. The record reflects that both Burnett and Martin evaluated plaintiff's request for a Kosher Menu Accommodation pursuant to the applicable Policy Directive and Operating Procedure.

Former Special Activities Coordinator Burnett stated that plaintiff requested an accommodation with a Kosher menu in October 2006, when he changed his religious preference from Protestant Christianity to Judaism. Burnett Aff. at ¶ 6 (docket no. 72-3).[14] Because he was not knowledgeable about this newly adopted faith, plaintiff's request for a Kosher menu was denied on December 1, 2006. *Id.* Following the denial, plaintiff changed his religious preference from Judaism to Protestant Christianity on May 3, 2007, an action which "suggests that prisoner Schuh was not sincerely interested in pursuing the practices of Judaism." *Id.* at ¶ 7. A few months later,

---

[14] The MDOC allows a prisoner to change their religious affiliation twice a year. *See* Policy Directive 05.03.150 ¶ S (docket no. 69-2) ("Each prisoner shall be allowed to identify his/her religious affiliation, but will not be recognized as belonging to, or allowed to participate in the services or activities of, more than one religious group at any given time. CFA prisoners may change their religious affiliation no more often than twice a year and must provide written notice of the change to the institutional chaplain.").

on October 24, 2007, plaintiff changed his faith preference a third time, i.e., from Protestant Christianity to Judaism. *Id.* at ¶ 8. This change was in conjunction with another request for Kosher menu accommodations. *Id.* Burnett did not respond to this request until December 1, 2007, the first date that plaintiff was eligible to re-apply for a Kosher menu. *Id.* Burnett denied this request for Kosher menu accommodations because plaintiff's pattern of behavior indicated that he was not sincere about the pursuit of the practice of Judaism. *Id.* at ¶ 9. The 2007 denial "was based on the demonstration of insincerity (changing back to Christianity until time to request the menu) rather than on the level of [plaintiff's] knowledge about his faith." *Id.*

Similarly, Special Activities Coordinator Martin articulated sufficient reasons under the policy directive and operating procedure to support a denial of the Kosher Food menu. Martin interviewed plaintiff on December 20, 2008. *See* Martin Memo to Smith (Jan. 11, 2009) (docket no. 69-2). Martin reached this determination based in part on the opinion of the interviewer (Chaplain Wyma), i.e., "I would suggest from my impressions [plaintiff] again does not have a true understanding of the Jewish knowledge and would highly suggest he not be granted the Kosher menu at this time." Martin Aff. at ¶ 15. Martin noted that plaintiff correctly responded to some basic Jewish beliefs (e.g., belief in one God) and two religious holidays, and identified a few examples of non-Kosher foods. However, Martin also listed a number of incorrect or unintelligible statements made by plaintiff with respect to basic Jewish beliefs and Kosher food. Martin Aff. at ¶¶ 16-21. Then, in February 2009 (before a decision had been reached), plaintiff wrote Martin a letter providing additional reasons to be placed on a Kosher menu, including a claim that Chaplain Wyma improperly administered the test. *Id.* at ¶¶ 22-25. Plaintiff included a written explanation of Judaism and Kosher requirements, in much greater detail than the information provided in the

interview. *Id.* at ¶ 25. However, Martin did not consider the letter because the MDOC operating procedure required him to review only information provided in the report from the interview. *Id.* at ¶ 26. Martin ultimately determined to deny plaintiff's request because of his general lack of understanding of Judaism and Kosher requirements. *Id.* at ¶¶ 27-28.

Martin denied plaintiff's request for Kosher food pursuant to the requirements of Operating Procedure 05.03.150A ¶ L because plaintiff could not: explain the major teachings of his designated religion (Judaism); explain why a Kosher diet is required by Judaism; give a definition of a Kosher diet; explain how a Kosher diet differs from food otherwise provided by the institution; and give examples of what types of food are not allowed under the Kosher diet. Accordingly, defendants Burnett and Martin are entitled to qualified immunity with respect to plaintiff's First Amendment Claim.

### c. Chaplain Wyma

Wyma stated the following background in his affidavit. On November 16, 2007, Wyma received correspondence from plaintiff requesting a "Tanakah" (presumably Tanakh, i.e., an acronym for the Torah, the Laws and the Writings), a Jewish religious calendar and information regarding his Kosher menu status. Wyma Aff. at ¶ 3 (docket no. 81-17). Wyma advised plaintiff that he did not have a Tanakh or Jewish calendar because his office no longer received these materials without charge. *Id.* Wyma stated that he provided plaintiff with contact information so that he could request these items for free. *Id.* Chaplain Wyma's affidavit stated that copies of religious vendor material is available in the Housing Unit, and that plaintiff could contact a Jewish organization for religious materials or to see a Rabbi. *Id.* at ¶ 7. Then, on May 20, 2008, Chaplain Wyma received correspondence from plaintiff requesting an original King James Bible and free

Christian literature. *Id.* at ¶ 8. The next day, Wyma informed plaintiff that he does not provide prisoners with a complete list of books in the religious library, but that each Housing Unit is provided with a list available to him. *Id.* at ¶ 9. Wyma gave plaintiff a King James Version Bible and other literature as requested. *Id.*

Plaintiff's claims arose from his December 20, 2008 interview Chaplain Wyma. *Id.* at ¶ 10. In December 2008, seven months after complying with plaintiff's request for Christian literature, Wyma interviewed plaintiff for his request to be placed on the Kosher menu. *Id.* at ¶ 10. Wyma forwarded plaintiff's interview responses to Special Activities Coordinator Martin on December 30, 2008, with a suggestion that plaintiff not be granted the Kosher menu because he did not have a true understanding of the Jewish faith and its principles. *Id.*

The record reflects that Wyma assisted plaintiff in locating Jewish Religious materials and a Rabbi. Viewing the facts in the light most favorable to plaintiff, the court finds no violation of the First Amendment with respect to these claims. The record reflects a prison chaplain attempting to accommodate a prisoner who identified himself as interested in practicing both Christianity and Judaism and who expressed a desire to receive Kosher meals.[15] Plaintiff was afforded reasonable opportunities to exercise his religious freedom. Accordingly, Chaplain Wyma is entitled to summary judgment with respect to plaintiff's First Amendment claims regarding the failure to provide Jewish religious materials and to locate a Rabbi.

However, the court reaches a different conclusion with respect to plaintiff's claim that Chaplain Wyma "falsely recorded" his responses at the interview. In his lengthy affidavit,

---

[15] Plaintiff's interest in both religions is evident in his affidavit, in which he defines himself as "a Reform Jew" who believes that "Jesus is the Messiah." Schuh Aff. at ¶ 7.

plaintiff submits why he believes that the Chaplain Wyma deliberately misrepresented plaintiff's interview answers in a letter to Special Activities Coordinator Martin. Schuh Aff. at ¶ 9. Viewing this evidence in the light most favorable to plaintiff, these statements create a genuine issue of material fact as to whether Chaplain Wyma took deliberate action to prevent plaintiff from obtaining the Kosher Menu Accommodation. Accordingly, Chaplain Wyma's motion for summary judgment should be denied on this First Amendment claim.

### 4. RLUIPA claims

Plaintiff alleged a violation of RLUIPA, a statute which prevents the government from placing a burden on prisoner's religious exercise. RLUIPA provides in pertinent part that:

> (a) No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1.

### a. Monetary damages for official capacity claims under RLUIPA

Plaintiff's seeks monetary damages against defendants Burnett, Martin, Smith and Wyma in their individual and official capacities under RLUIPA. The Sixth Circuit has held that the Eleventh Amendment bars claims for money damages in RLUIPA claims brought against state officials in their official capacities. *Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009).

Accordingly, these defendants are entitled to summary judgment with respect to plaintiff's official capacity claims under RLUIPA.[16]

### b.    Special Activities Coordinators Burnett and Martin

Plaintiff alleged that defendants Burnett and Martin violated RLUIPA by denying his requests for a Kosher diet. Defendants seek summary judgment on these claims based upon the defense of qualified immunity.

As an initial matter, there is little guidance as to whether limiting a prisoner to requesting a Kosher menu once per year imposes a substantial burden on his exercise of religion. RLUIPA does not define the operative term "substantial burden." In an unpublished decision from 2007, the Sixth Circuit looked to the Supreme Court's consideration of that term in the First Amendment context.

> In short, while the Supreme Court generally has found that a government's action constituted a substantial burden on an individual's free exercise of religion when that action forced an individual to choose between "following the precepts of her religion and forfeiting benefits" or when the action in question placed "substantial pressure on an adherent to modify his behavior and to violate his beliefs," [*Sherbert v. Verner*, 374 U.S. 398, 404 (1963); *Thomas v. Review Board of the Indiana Employment Security Division*, 450 U.S. 707, 717-18 (1981)], it has

---

[16] Whether plaintiff can obtain monetary damages in their individual capacities remains an open question. This court has previously concluded that RLUIPA may allow monetary damages against government defendants in their individual capacity. *Atkins v. Christiansen*, No. 1:08-cv-972 (W.D. Mich. Nov. 20, 2009) (order declining to hold that damages could not be recovered against a state actor in his individual capacity under RLUIPA). More recently, another judge in this court found that RLUIPA damages were not available against a defendant in his individual capacity, observing that "[e]very federal appellate court that has addressed the issue has held that RLUIPA, as an exercise of Congress' Spending Clause power, does not authorize a claim for damages against state employees in their individual capacities" (citing opinions from the 4th, 5th, 7th, and 11th Circuits). *Green v. Tudor*, 685 F. Supp. 2d 678, 699 (W.D. Mich. 2010). The Sixth Circuit has not expressly addressed this issue. However, in *Colvin v. Caruso*, 605 F.3d 282, 289 (6th Cir. 2010), a case involving RLUIPA claims against officials in both their official and individual capacities, the Sixth Circuit court disposed of all claims for monetary damage, citing *Cardinal v. Metrish*, *supra*, for the proposition that monetary damages were not available under RLUIPA.

found no substantial burden when, although the action encumbered the practice of religion, it did not pressure the individual to violate his or her religious beliefs.

*Living Water Church of God v. Charter Township of Meridian*, 258 Fed. Appx. 729, 734 (6th Cir. 2007), citing also *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 449 (1988) and *Braunfield v. Brown*, 366 U.S. 599, 605-06 (1961). *See also, Barhite v. Caruso*, 377 Fed. Appx. 508, 511 (6th Cir. 2010) (quoting "substantial burden" standard as set forth in *Living Water Church of God*).

The court further observed that the statute requires courts "to walk a thin line" in resolving RLUIPA cases:

> On one hand, RLUIPA's definition of religious exercise covers most any activity that is tied to a religious group's mission, and "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to [an individual's] religion." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n. 13, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005) (inmate's RLUIPA action). On the other hand, and in tension with this broader definition of religious exercise, Congress has cautioned that we are to interpret "substantial burden" in line with the Supreme Court's "Free Exercise" jurisprudence, which suggests that a "substantial burden" is a difficult threshold to cross.

*Living Water Church of God*, 258 Fed. Appx. at 736.

In this regard, the Supreme Court does not "read RLUIPA to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005). Thus, "an accommodation must be measured so that it does not override other significant interests." *Id.* The Supreme Court further cautioned in a footnote, "[i]t bears repetition . . . that prison security is a compelling state interest, and that deference is due to institutional officials' expertise in this area." *Id.* at fn. 13.

Defendants present no argument on whether the Policy Directive substantially burdens plaintiff's exercise of religion.[17] Nevertheless, assuming that plaintiff has presented evidence on which a reasonable trier of fact could conclude that defendants' actions resulted in a substantial burden on the exercise of his faith (due to the inability to obtain Kosher food for one year), defendants Burnett and Martin are entitled to judgment in their favor because the rights plaintiff claims under RLUIPA were not clearly established at the time. Neither the statute nor the United States Supreme Court has defined the term "substantial burden." While the Sixth Circuit has addressed the issue in an unpublished opinion, there is no published decision on this issue. Accordingly, defendants Burnett and Martin are entitled to qualified immunity as to Count VI.

### c. Chaplain Wyma

While Chaplain Wyma seeks summary judgment on the RLUIPA claims, he does not submit any relevant briefing on the matter.[18] Accordingly, defendant Wyma's motion for summary judgment should be denied as to the RLUIPA claims.

### 5. Warden Smith

Plaintiff alleged that Warden Smith's December 6, 2007 memorandum denying plaintiff a Kosher menu improperly described Chaplain Snyder's recommendation, which stated that plaintiff was able, not unable, to provide substantial information about Judaism during the interview and which recommended that plaintiff be granted a Kosher diet. Plaintiff alleged that Warden Smith

---

[17] Defendants argue that they are entitled to qualified immunity because there is no clearly established federal law establishing an inmate's right to individual capacity monetary damages under RLUIPA. This does not appear to be an appropriate application of the doctrine of qualified immunity, which determines whether a defendant's conduct violated a plaintiff's clearly established statutory or constitutional rights.

[18] Chaplain Wyma states that he adopts the qualified immunity arguments raised in Martin's Brief (i.e., Argument III of docket nos. 60 and 61). *See* Wyma's brief at p. 25. However, this argument is inapplicable to the remaining claim against Wyma; Martin was not accused of falsifying interview responses.

was aware of Chaplain Snyder's recommendation and deliberately presented it in a false light to plaintiff. Plaintiff has not provided a copy of Chaplain Snyder's recommendation.

Warden Smith's memorandum denying the Kosher menu request states in pertinent part as follows:

> Your requested accommodation for a [K]osher menu has been reviewed by the Special Activities Coordinator. I have been advised by the Special Activities Coordinator your [sic] request for accommodation with a kosher menu is **denied** at this time. This is based upon your history with Kosher menu accommodations. You were denied accommodation last on 12-1-06 after which you converted back to Protestant Christianity. You "converted" back to Judaism on 10-24-07 as part of your request for a Kosher menu, which was initiated in October. Whatever the motivation for requesting the Kosher menu, there is no indication it is based out of a sincere desire to pursue the practices of Judaism. It was reported that you were unable to provide quite a bit of information about Judaism when you were interview [sic] by Chaplin [sic] Snyder.
>
> It is understood that denial of admission to a special religious menu is not a failure to recognize faith preference. Requests to declare religious preference, purchase and possess religious items and to attend religious services must be processed according to Department policy.

Warden Smith Memorandum (Dec. 6, 2007) (emphasis in original) (docket no. 89-5).

In his affidavit, Warden Smith pointed out that there was no indication that plaintiff's motivation for a requesting the Kosher menu was based out of a sincere desire to pursue the practice of Judaism, noting that plaintiff converted back to Protestant Christianity after he was denied the Kosher menu in December 2006. Smith Aff. at ¶¶ 12-14 (docket no. 87-2). While Warden Smith referenced plaintiff's interview with Chaplain Snyder, plaintiff's lack of knowledge regarding Judaism during the interview was not the stated reason for the denial. Warden Smith's memorandum reflected that plaintiff's Kosher menu request was denied because plaintiff lacked a sincere desire to practice Judaism, due to his fluctuating history of "conversion" back and forth

between Protestant Christianity and Judaism. Accordingly, Warden Smith is entitled to summary judgment as to Count VI.

### F.    Count VII

In this count, plaintiff alleged that he was he was improperly denied constitutionally adequate medical care because he has been refused an acid-reflux diet to help with his diagnoses of acid reflux, gastroesophageal reflux disease (GERD), and esophagitis. Plaintiff alleged that he was told by a doctor on November 20, 2007 that he needed to consult with a dietician. Between that date and January 8, 2008, plaintiff's repeated requests to see a dietician were ignored. After filing grievances, plaintiff met with Dietician Willard on May 13, 2008. Six days later, Willard sent a memorandum, stating that she needed to review his file and refusing to place plaintiff on a reflux diet until after they met again. The second meeting never occurred.

Dietician Willard set forth the following facts in her affidavit. Plaintiff's electronic medical record lists a diagnosis for "Gastritis/gastoduodenitis." Willard Aff. at ¶ 6 (docket no. 81-18). The chart for plaintiff's November 20, 2007 appointment with Dr. Migliorino documents that plaintiff denied abdominal cramping, abdominal pain, belching, nausea, reflux and vomiting. *Id.* at ¶¶ 8-9. Plaintiff's "degree of control" was documented as "good," which was an improvement from "fair" control on June 14, 2007. *Id.* at ¶ 9. Dr. Migliorino's documentation from November 20, 2007, has "no comment or assessment that prisoner Schuh should be on a reflux diet, as prisoner Schuh states." *Id.* Dietician Willard met with plaintiff on May 13, 2008 and sent him a memorandum on May 19th informing him: that she requested the results of plaintiff's Upper Gastrointestinal procedure (UGI) that plaintiff informed her was performed in November, 2004, at St. Joseph Hospital; that she would schedule him for an appointment to discuss the UGI results after

she received them; that plaintiff should "stop consuming that high fat snacks and hot chocolate that he admitted to consuming;" that plaintiff "stop performing sit-ups;" and that plaintiff "continue to self-select from the regular menu until our next scheduled appointment." *Id.* at ¶ 11. Willard was never notified that plaintiff's UGI results were received by the Health Care clinic at ICF, which was the contingency for a follow up appointment. *Id.* at ¶ 12. Plaintiff met with a medical provider on July 14, 2008 at which time he requested an Acid Reflux diet. *Id.* at ¶ 13. The medical provider instructed plaintiff to self select from the regular menu. *Id.*

Plaintiff has supported his claims in the complaint by verified statements. In addition, he has provided a copy of an affidavit from Pragna H. Pandya, M.D., a doctor employed by Correctional Medical Services, stating that in July 2005, plaintiff "has been on Prilosec prescribed to reduce the acid in his stomach as treatment for his stomach pain and gastro-esophageal reflux disease (GERD)." *See* Pandya Affidavit, filed in *Schuh v. Dykstra*, 1:07-cv-725 (W.D. Mich.) (docket no. 97-6). Plaintiff has also submitted copies of medical records which indicate a reported history of GERD. *See* Medical Records (docket no. 97-5). Defendant Willard's affidavit fails to attach relevant medical records alluded to in her affidavit which might have allowed the court to determine if there was a genuine issue of material fact regarding plaintiff's medical condition and diet. Viewing the evidence in the light most favorable to plaintiff, genuine issues of fact appear to exist with respect to plaintiff's claim regarding his placement on a reflux diet. Accordingly, Dietician Willard's motion for summary judgment should be denied as to Count VII.

**G.     Count VIII**

In this count, plaintiff alleged: that he was physically and sexually assaulted on July 11, 2008; sexually harassed after that date; and that the assaults and harassment were retaliatory.

33

### 1.        Plaintiff's allegations

On July 11, 2008, plaintiff engaged in another alleged act of self-inflicted injury by swallowing 50 Excedrin migraine tablets while making direct eye contact with defendant RUO Datema.  When plaintiff asked Datema to contact medical staff for him, Datema slammed the door window shutter closed, told plaintiff that he had not seen anything, told plaintiff that he did not care if plaintiff died and did not call any medical personnel.  Shortly thereafter, plaintiff was being escorted from his cell in full restraints by defendants Datema, Sisson, Lahr and Wolever.  When they entered Unit 2, RUO Gorman instructed the other officers to bring plaintiff to the dayroom.  Plaintiff was placed in the holding cell and told to back up to the cell door so that the restraints could be removed. Plaintiff refused to back up, telling the RUOs that he needed medical attention because he had taken an overdose of pills and asking them to contact the sergeant.  According to plaintiff, defendant Wolever unlocked the door, entered the cell, and struck him in the face, splitting open plaintiff's left eye brow.  Defendants Lahr, Datema, Sisson, and Gorman joined Wolever and grabbed plaintiff's arms and legs while he was still in restraints, allegedly slamming his head into the wall, and then slamming him face-down onto the floor.  While defendants Wolever, Sisson, Lahr and Datema held plaintiff's arms and legs down, plaintiff suffered a painful sexual assault in his rectum and heard RUO Gorman ask him how he liked it.  Defendants Wolever, Lahr, Datema, Sisson and Gorman left the dayroom, laughing and slapping one another on the back. Shortly thereafter, Sergeant Slugbear entered the dayroom.

Plaintiff was seen in the ICF medical department and transported to the Ionia County Hospital, where he received four stitches in the left eyebrow from Wolever's blow and was admitted

to intensive care for head injuries and drug overdose. Plaintiff was released the next day (July 12, 2008), returned to ICF and placed on suicide watch.

In subsequent days, plaintiff alleged that he was visited by defendants Wolever (July 16th), Datema (July 18th) and Sisson (July 19th), each of whom verbally taunted him about the assault and threatened further harm. Then, on July 20th, Wolever threatened and sexually degraded plaintiff, causing him to fear for his life. Gorman repeatedly referred to the earlier incident, threatened further sexual assaults, and engaged in alleged "sexually predatory" behavior against plaintiff, denied plaintiff a meal tray and allegedly threatened to kill plaintiff and his family if plaintiff did not drop his investigation into the July 11, 2008 incident.

In addition, plaintiff alleged that Gorman and Sisson took action against plaintiff in retaliation for past grievances filed against them. Plaintiff also alleged that RUO Greenfield exceeded his authority by rejecting one or more grievances at Step I (related to these incidents). Finally, plaintiff alleged that Inspector Goodson performed a poorly conducted investigation which amounted to deliberate indifference to his well-being.

## 2. Defendants' affidavits and medical records

In his affidavit, Kacy Datema stated that he did not observe plaintiff ingest 50 Excedrin migraine pills on July 11, 2008. Datema Aff. at ¶ 5 (docket no. 81-19). He did not have an independent recollection of the events, but after refreshing his memory by reviewing a Critical Incident Report (ICF 183-08), he stated: that plaintiff "went limp" and refused to walk while being escorted; that he applied a "transport wrist lock" on plaintiff and ordered him to walk; that plaintiff complied and was escorted backwards to Unit 2 and placed in the B-wing dayroom carrel, where his restraints were removed; after he was secured in the B-wing dayroom carrel, plaintiff began banging

his head against the wall and unit staff were notified. *Id.* at ¶¶ 6-12. Datema further stated that the allegations of assault on July 11, 2008 as set forth on pages 27-28 of the complaint "are entirely false," and that neither he, Wolever, Sisson, Lahr, nor Gorman entered the dayroom carrel or struck plaintiff, and Gorman did not put his fingers in plaintiff's rectum. *Id.* at ¶ 13-14.

RUO Sisson stated that he assisted Datema and Wolever in escorting plaintiff on that date, that plaintiff went limp, refused orders to walk, requiring defendants to lift plaintiff from the floor to a standing position. Sisson Aff. at ¶¶ 4-5 (docket no. 81-20). Datema and Wolever applied a transport wrist lock to plaintiff and escorted him to the dayroom carrel where his restraints were removed. *Id.* at ¶ 6. Shortly after defendants (Datema, Wolever and Sisson) left, "[p]laintiff began banging his head on the wall in the dayroom carrel, causing his head to bleed." *Id.* at ¶¶ 6-7. Sgt. Schluckbier was notified of plaintiff's actions and Sisson left without further incident. *Id.* at ¶ 7. Sisson denied that he slammed plaintiff's head into the wall or slammed plaintiff onto the floor as alleged, and stated that Gorman did not digitally penetrate plaintiff's rectum. *Id.* at ¶¶ 8-9.

Similarly, RUO Wolever stated in his affidavit that: he assisted Datema and Sisson in escorting plaintiff on July 11, 2008; plaintiff went limp during the escort; and that he applied a transport wrist lock as they escorted plaintiff to the dayroom carrel. *Id.* at ¶¶ 3-7. After plaintiff was secured in the dayroom carrel, he began banging his head against the wall and yelled "Get my shrink now!" *Id.* at ¶ 8. Wolever denied striking plaintiff in the eye, slamming his head into the wall, slamming his body onto the floor, or holding plaintiff's arms and legs while Gorman placed his fingers in plaintiff's rectum as alleged. *Id.* at ¶¶ 11-13. Furthermore, RUO Gorman did not place his fingers in plaintiff's rectum. *Id.* at ¶ 13.

RUO Gorman stated in his affidavit that he had a key to the Unit 2, B-wing dayroom carrel, opened the door, placed plaintiff in the carrel, and locked the door. Gorman Aff. at ¶ 3 (docket no. 81-22). No one assaulted plaintiff during the course of securing him in the carrel. *Id.* The escort officers, Wolever, Datema and Sisson, left the are and did not re-enter the dayroom carrel after plaintiff was secured. *Id.* at ¶ 4. Officer Lahr was not present, because he did not work in Unit 2 and did not participate in plaintiff's escort from Unit 1 to Unit 2. *Id.* at ¶ 5. After plaintiff was secured in the dayroom carrel, he began banging his head against the wall, health services was contacted, and RN Margoulis responded. *Id.* at ¶ 6. Gorman denied that he, Lahr, Datema, Sisson or Wolever rammed plaintiff's head against the wall or slammed him to the floor. *Id.* at ¶ 7. Gorman further denied that he put his fingers in plaintiff's rectum at any time, or that he made derogatory sexual remarks as alleged by plaintiff. *Id.* at ¶¶ 9-11.

In his affidavit, RUO Lahr stated that he was not involved in the alleged assaults of July 11, 2008, because he was working in Housing Unit 1 and the alleged assault occurred in the Unit 2 dayroom carrel. Lahr Aff. at ¶¶ 1-8 (docket no. 81-23).

All defendants stated in their affidavits that they did not harass or threaten plaintiff after the alleged July 11, 2008 assault. *See* Datema Aff. at ¶ 14; Sisson Aff. at ¶ 10; Wolever Aff. at ¶ 14; Gorman Aff. at ¶ 15; and Lahr Aff. at ¶ 9.

Sergeant Schluckbier stated in an affidavit: that he was reviewing a major misconduct report in Unit 2 when notified that plaintiff was in the Unit 2 dayroom carrel banging his head against the wall. Schluckbier Aff. at ¶ 4 (docket no. 81-24). Schluckbier went to see plaintiff, who told him that Wolever hit him in the face, Gorman kicked him, Gorman stuck his fingers in "plaintiff's ass" and that the affiant (Schluckbier) was present when all of this occurred. *Id.* at ¶ 5.

Schluckbier stated that plaintiff's statements were false and prepared a critical incident report (ICF 183-08), which reflected that Schluckbier's involvement commenced at 11:46 a.m. (1146 hours). *Id.* at ¶ 5.

Plaintiff's medical records from July 11, 2008 reflect that plaintiff complained of a laceration to the left above the eye and middle of the head, which occurred in the housing unit day room with the following history:

> Called to unit to check Mr. Schuh related to banging head on wall per custody staff. 1150 States "he took 150 Zantac, ASA, Tylenol. 50 tabs 1 1/2 hrs ago & 100 a half an hour ago. Also states he was raped and [assaulted]."

MDOC Progress Notes (docket no. 92 at p. 2). Plaintiff's medical records from July 12, 2008 reflect that he returned from the Ionia Hospital that evening "with sutures above left eye brow and dermabond on top of head" and that "[w]ounds self-inflicted by patient banging his head on the wall." MDOC Progress Notes (docket no. 92 at p. 2).

### 3.     Discussion

### a.     Assault by Lahr, Datema, Sisson, Gorman, and Wolever

Plaintiff has alleged claims that defendants Lahr, Datema, Sisson, Gorman, and Wolever physically and sexually assaulted him on July 11, 2008. The medical records before the court reflect that plaintiff suffered injuries to his face and head. However, Lahr, Datema, Sisson, Gorman, and Wolever have submitted deny that an assault took place and stated that plaintiff's injuries were self inflicted. Viewing the evidence in the light most favorable to plaintiff, the court concludes that a genuine issue of material fact exists with respect to plaintiff claim that he was assaulted on July 11, 2008. Accordingly, Lahr, Datema, Sisson, Gorman, and Wolever's motion for summary judgment should be denied as to the assault claims in Count VIII.

### b.      Harassment by Lahr, Datema, Sisson, Gorman, and Wolever

Defendants do not address the alleged harassment and verbal abuse of plaintiff, other than to deny that it occurred.  Nevertheless, plaintiff's allegations are insufficient to state a claim for relief under § 1983.  Harassment and verbal abuse do not constitute infliction of pain or cruel and unusual punishment prohibited by the Eighth Amendment.  J*ohnson v. Unknown Dellatifa*, 357 F.3d 539, 546 (6th Cir. 2004); *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1997).  Lahr, Datema, Sisson, Gorman, and Wolever's motion for summary judgment should be granted as to plaintiff's claim for harassment alleged in Count VIII.

### c.      Retaliation by Gorman and Sisson

Plaintiff alleged that RUO Gorman and RUO Sisson took action against him for filing grievances against those two officers.  A plaintiff claiming retaliation must present more than conclusory allegations of retaliatory motive.  *See Harbin-Bey*, 420 F.3d at 580.  *See also*, discussion in § III.D.3, *supra*.  Here, plaintiff presented only conclusory allegations of retaliation against these two defendants and does not identify any particular protected conduct which gave rise to the alleged retaliation other than filing grievances.  Gorman and Sisson's motion for summary judgment should be granted with respect to the retaliation claim in Count VIII.

### d.      Denial of food by Gorman

In his verified complaint, plaintiff alleged that RUO Gorman denied plaintiff his breakfast tray on August 13, 2008.  In his affidavit, Gorman stated that he "did not refuse to provide Plaintiff his breakfast tray or his lunch tray unless he 'sucked my dick' on 8/13/08, as alleged at page 33 of 46 of the Complaint."  Gorman Aff. at ¶ 13.  Plaintiff has failed to allege a constitutional violation.  A temporary inconvenience, such as missing one meal, does not rise to the level of an

Eighth Amendment deprivation. *See Dellis v. Corrections Corporation of America*, 257 F.3d 508, 511 (6th Cir. 2001) (temporary inconveniences "did not demonstrate that the conditions fell beneath the minimal civilized measure of life's necessities as measured by a contemporary standard of decency"); *Palmer v. Johnson*, 193 F.3d 346, 352 (5th Cir. 1999) (missing one meal does not rise to the level of a cognizable constitutional injury); *Marr v. Case*, No. 1:07-cv-823, 2008 WL 191326 (W.D. Mich. Jan. 18, 2008) ("the missing of a single meal does not rise to the level of an Eighth Amendment deprivation"). *See generally, Cunningham v. Jones*, 667 F.2d 565, 565-66 (6th Cir. 1982) (affirming district court's decision that serving prisoner plaintiff only one meal a day for 15 consecutive days did not violate prisoner's Eighth Amendment rights). Accordingly, Gorman's motion for summary judgment should be granted with respect to the denial of a meal tray in Count VIII.

### e. Rejection of grievance by Greenfield

Plaintiff alleged that RUO Greenfield violated his rights by rejecting one or more grievances at Step I. This allegation fails to state a claim for relief. A prison official whose only role involved the denial of an administrative grievance cannot be liable under § 1983. *Shehee*, 199 F.3d at 300. Accordingly, Greenfield's motion for summary judgment should be granted with respect to Count VIII.

### f. Inspector Goodson

Inspector Goodson investigated the incident, noting that plaintiff alleged that on July 11, 2008 at 11:24 a.m., RUO Gorman "kicked me in the face and put his finger in my ass" and that RUO Wolever "hit me in the face." Goodson Aff. at ¶ 3. Inspector Goodson conducted an investigative interview of 15 people, including plaintiff, RUO's Gorman and Wolever, and other

officers and medical staff, as well as written statements of the involved parties. *Id.* at ¶ 4. Her investigation was reviewed by Internal Affairs supervisory staff and MDOC Director Caruso, all of whom concurred in her findings and conclusions. *Id.* at ¶ 5. The investigation was closed on September 11, 2008, with no disciplinary actions warranted or taken against the officers. *Id.* While plaintiff disagrees with Inspector Goodson's conclusion, he has presented no evidence to demonstrate that she performed an improper investigation. Further, even if plaintiff had presented such evidence, he cannot prevail because prison officials do not incur § 1983 liability for failing to properly investigate a grievance. *See Carlton*, 76 Fed. Appx. at 644; *Geiger*, 404 F.3d at 374; *Wilkins*, 2009 WL 1904414 at *9. Accordingly, Inspector Goodson is entitled to summary judgment on Count VIII.

### H. Count IX

This count arises from plaintiff's claim that he was assaulted while sleeping in his cell on July 13, 2008. Defendant RUO Sisson and non-party RUO Mawer allegedly entered the cell, held plaintiff down with their feet and roughly restrained him, causing plaintiff injury and scars. The two officers then dragged him to the dayroom cell, where he could be interviewed by a psychologist. The psychologist who interviewed plaintiff on that date, non-party Heather L. Douglas, M.A., set forth the following facts in her affidavit. She had an appointment to see plaintiff as a follow-up to recent behavior where he claimed to have taken 150 pills on July 11, 2008, and was later taken to the hospital to treat lacerations caused by banging his head against the wall. Douglas Aff. at ¶ 3 (docket no. 81-25). Ms. Douglas reported that she was present the next day when two officers approached plaintiff to take him to the unit day room. Douglas Aff. at ¶ 4. The officers did not assault plaintiff. *Id.* In his affidavit, RUO Sisson denies "that on 7/13/08 I used my feet to place

restraints on Plaintiff and dragged him to the Unit dayroom to see a psychologist." Sisson Aff. at ¶ 11 (docket no. 81-20).

Plaintiff's medical record from July 13, 2008 at 8:43 a.m., prepared by Ms. Douglas, reflects an entirely different situation than alleged by plaintiff:

> Inmate is lying on floor on his mattress when we approached the inmate. He refused to move and custody staff removed him from this cell in restraints with little resistance by the inmate. However he then reports that he was assaulted by staff during our interview.

*Id.*; MDOC Progress Notes (docket no. 92 at pp. 5-6). Upon examination, plaintiff reported "hearing voices" indicating that he should kill himself, stated "I want to kill myself," and identified a belief that "all MDOC staff are trying to kill him." *Id.* at p. 6. Plaintiff was diagnosed as a moderate suicide risk "due to self-injurious behaviors/gestures or threats of self-harm/suicide." *Id.* at p. 8. His diagnoses included malingering, polysubstance dependence, borderline personality disorder and antisocial personality disorder. *Id.* at p. 5.

An issue of fact exists between the facts set forth in plaintiff's complaint and that the affidavits regarding the assault that allegedly occurred on July 13, 2008. However, plaintiff has failed to present significant probative evidence in support of his allegations. Plaintiff's version of the facts as set forth in the verified complaint is blatantly contradicted by the medical records prepared by the non-party psychologist who witnessed the event and later interviewed plaintiff. Under these circumstances, no reasonable jury could believe that plaintiff was assaulted as alleged. Accordingly, RUO Sisson is entitled to summary judgment on Count IX.

## IV.    Recommendation

For the reasons set forth above, I respectfully recommend:

That defendant Johnson's motion for summary judgment (docket no. 55) be **DENIED** as to Count I;

That defendant Baitinger, Hernandez, Beak and Gagne's motion for summary judgment (docket no. 80) be **DENIED** as to Count I;

That defendant Smith's motion for summary judgment (docket no. 80) be **GRANTED** as to Counts II and VI, and that he be dismissed from this action;

That defendant Caruso's motion for summary judgment (docket no. 71) be **GRANTED** as to Counts III and VI, and that she be dismissed from this action;

That defendant Tkach's motion for summary judgment (docket no. 80) be **GRANTED** as to the retaliation claim in Count IV and **DENIED** as to the assault claim in Count IV;

That defendant Greenfield's motion for summary judgment (docket no. 80) be **GRANTED** as to the retaliation claim in Count IV, **DENIED** as to the assault claim in Count IV, and **GRANTED** as to Count VIII;

That defendant Goodson's motion for summary judgment (docket no. 80) be **GRANTED** as to Counts IV and VIII and that she be dismissed from this action;

That defendant Burnett's motion for summary judgment (docket no. 71) be **GRANTED** as to Count VI and that he be dismissed from this action;

That defendant Martin's motion for summary judgment (docket no. 60) be **GRANTED** as to Count VI and that he be dismissed from this action;

That defendant Wyma's motion for summary judgment (docket no. 80) be **GRANTED** as to the First Amendment claims in Count VI that he failed to provide religious literature and to provide access to a Rabbi, **DENIED** as to the First Amendment Claim that he falsely recorded responses on plaintiff's Kosher test, **GRANTED** as to the RLUIPA claim for damages in his official capacity, and **DENIED** as to all other RLUIPA claims;

That defendant Willard's motion for summary judgment (docket no. 80) be **DENIED** as to Count VII;

That defendant Lahr, Datema and Wolever's motion for summary judgment (docket no. 80) be **GRANTED** as to the harassment claims in Count VIII and **DENIED** as to the assault claims in Count VIII;

That defendant Gorman's motion for summary judgment (docked no. 80) be **GRANTED** as to the harassment, retaliation and denial of meal tray claims in Count VIII and **DENIED** as to the assault claims in Count VIII;

That defendant Sisson's motion for summary judgment (docket no. 80) be **GRANTED** as to the harassment and retaliation claims in Count VIII, **GRANTED** as to the retaliation claim alleged in Count VIII, **DENIED** as to the assault claims in Count VIII, and **GRANTED** as to the assault claims in Count IX; and,

That plaintiff's claim for injunctive relief in the form of a Kosher Menu Accommodation in Count VI be **DISMISSED** as moot.

Dated:  February 11, 2011                              /s/ Hugh W. Brenneman, Jr.
                                                       HUGH W. BRENNEMAN, JR.
                                                       United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report. All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order. *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).